IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| THE STATE OF LOUISIANA, By and through the Louisiana Department of Wildlife and Fisheries, <br><br> PLAINTIFFS, <br><br> v. <br><br> GINA RAIMONDO, in her official capacity as UNITED STATES SECRETARY OF COMMERCE; DEPARTMENT OF COMMERCE; RICK SPINRAD, in his official capacity as ADMINISTRATOR OF THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; CHRIS OLIVER, in his official capacity as ASSISTANT ADMINISTRATOR FOR FISHERIES; SAMUEL D. RAUCH III, in his official capacity as DEPUTY ASSISTANT ADMINISTRATOR FOR REGULATORY PROGRAMS; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; NATIONAL MARINE FISHERIES SERVICE; <br><br> DEFENDANTS. | CIV. NO. _____ |

**MEMORANDUM OF LAW IN SUPPORT OF LOUISIANA'S
MOTION FOR TEMPORARY RESTRAINING ORDER**

Plaintiff files this Motion for a Temporary Restraining Order (TRO) contemporaneously with a complaint for declaratory and injunctive relief against the Sea Turtle Conservation; Shrimp Trawling Requirements, 84 Fed. Reg. 70,048 (Dec. 20, 2019) ("2019 Final Rule"). The 2019 Final Rule poses an existential threat to Louisiana's shrimping industry. And Defendants have arbitrarily allowed it to go into effect, notwithstanding that it requires equipment that is widely unavailable.

The 2019 Final Rule is the first time that Defendants required inshore skimmers to be outfitted with specialized, expensive equipment known as Turtle Excluder Devices ("TEDs").

Recognizing the financial and logistical difficulties installing TEDs will impose on the shrimping industry, the 2019 Final Rule included a delayed effective date—it would not take effect until April 1, 2021. In the interim, however, the COVID-19 pandemic spawned supply-chain, manpower, and training disruptions that made it impossible to comply with the TEDs requirements *even by* the delayed effective date. So on March 31, 2021, Defendants again delayed the effective date until August 1, 2021. Sea Turtle Conservation; Shrimp Trawling Requirements, 86 Fed. Reg. 16,676 (Mar. 31, 2021).

The urgent problem prompting this motion is that nothing about the supply-chain, manpower, and training disruptions has changed. COVID-related disruptions still abound, rendering skimmer captains still unable to comply with the 2019 Final Rule due to the sheer unavailability of TEDs. Moreover, Defendants have still failed to conduct the in-person TEDs training promised in the 2019 Final Rule and subsequent publications, and which Defendants themselves found necessary to avoid improper installation and use of TEDs, which could lead to greater harm to listed sea turtles. 86 Fed. Reg. at 16,677. Even so, Defendants have failed to extend the effective date, despite the Louisiana Department of Fisheries and Wildlife's (LDWF) protestations. *See* Cagle Decl. Exh. A. Defendants' failure to extend the effective date is arbitrary and capricious and will cause irreparable harm to skimmers, who make up the bulk of Louisiana's shrimping industry. Absent immediate relief from this Court, shrimpers will be precluded from the peak shrimping season because circumstances outside their control make it impossible to comply with a Rule whose effective date Defendants have already extended once for reasons that remain unchanged. This Court should grant this motion and save Louisiana's shrimping industry by delaying the 2019 Final Rule's implementation date.

**FACTUAL BACKGROUND**

Since the late 1980s, Defendants have required Turtle Excluder Devices (TEDs) on certain

2

shrimping vessels. A TED is an addition to shrimping nets designed to prevent sea turtles from being trapped in the net and drowning. Requiring TEDs on large, offshore vessels is not new. But requiring TEDs for skimmer vessels inshore *is* new—inshore skimmer vessels were previously exempt from TEDs requirements so long as they operated within limits on tow time, *i.e.*, limits on how long their nets are in the water. Defendants designed those restrictions to ensure that turtles incidentally caught during the tow could be safely returned to the water when the nets are periodically emptied.

Since the inception of TED requirements, Defendants have excluded inshore skimmers from any obligation to employ TEDs. In 2012, that exclusion looked threatened when Defendants began regulatory proceedings that contemplated requiring TEDs in skimmers. The exclusion ultimately survived, however, after Defendants made several specific fact findings indicating that that TEDs were of limited and "highly uncertain" ecological benefit on inshore waters, and the economic ramifications of a TED requirement on inshore skimmers would be potentially significant. *See* 78 Fed. Reg. 9,024 (Feb. 7, 2013). Indeed, in a 2014 opinion, Defendants concluded that allowing shrimp fisheries to continue as prosecuted under then-existing regulations was not likely to jeopardize the continued existence of any of listed species.

But Defendants changed course in 2019 and issued a Final Rule requiring, for the first time, that inshore skimmers use TEDs. *See* 84 Fed. Reg. 70,048 (Dec. 20, 2019). Recognizing that the inshore shrimping industry did not have TEDs because they had long been excluded from those requirements—and that serious logistical and financial difficulties would attend simultaneously outfitting an entire skimmer fleet with TEDs—Defendants delayed the effective date of the Final Rule until April 1, 2021. *See id.* ("We believe delaying the effectiveness of the rule until April 1, 2021 is warranted, as that will be an adequate period to allow for the manufacture of the necessary number of TEDs and for fishers, particularly lower income fishers, to financially prepare for the

3

regulation."). Beyond that, Defendants promised to conduct "TED training workshops . . . during the phase-in period." *Id.*

Then COVID hit. The well-known disruptions the pandemic caused led Defendants to issue a Delay Rule on March 31, 2021, further delaying the 2019 Final Rule's effective date. 86 Fed. Reg. 16676-01 (Mar. 31, 2021). On May 20, 2021, LDWF sent a letter to Defendants highlighting the shrimping industry's continuing inability to comply with the 2019 Final Rule, as well as data indicating the 2019 Final Rule is unwarranted. *See* Cagle Decl. Exh. A. Defendants took no action in response. Since then, shrimping season began on August 9th, but the 2019 Final Rule precludes a substantial portion of the Louisiana shrimping industry from participating in it because they can't acquire the mandated TEDs.

## LEGAL STANDARD

To merit a temporary restraining order, the moving party must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat that failure to grant the injunction will result in irreparable injury to the moving party, (3) the threatened injury outweighs any damages the injunction may cause defendant, and (4) the injunction is in the public interest. *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014). "None of [these] four requirements has a fixed quantitative value." *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 582 (E.D. La. 2016). Rather, "a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* Accordingly, the Court must conduct "a delicate balancing," which weighs "the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury that possibly could flow from the denial of preliminary relief." *Id.*

Most critical here, the Administrative Procedure Act expressly provides authority to stay the effective date of an irreparably harmful rule. 5 U.S.C. §705 ("[T]o the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to *postpone*

4

*the effective date of an agency action* or to preserve status or rights pending conclusion of the review proceedings.") (emphasis added).

## ARGUMENT

I. **THE DEPARTMENT IS SUBSTANTIALLY LIKELY TO SUCCEED ON ITS CLAIM THAT DELAYING THE TEDS RULE'S IMPLEMENTATION DATE UNDER THE APA IS NECESSARY TO PREVENT IRREPARABLE INJURY.**

The burden to establish a likelihood of success on the merits is not demanding. "As long as the court cannot say there is no likelihood of prevailing on the merits but finds the factor of substantial likelihood of success present to some degree, then the party seeking the injunction has met its burden." *Family Rehab., Inc. v. Azar*, 3:17-cv-3008, 2018 WL 3155911, at *3 (N.D. Tex. June 28, 2018) (citing *Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980)). The law precludes temporary relief only "if there is *no chance* that the movant will eventually prevail on the merits." *State of Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) (emphasis added). In other words, that the movant "is unable, in an abbreviated proceeding, to prove with certainty eventual success does not foreclose the possibility that temporary restraint may be appropriate." *Id.*

Plaintiff has easily met this burden. In refusing to further extend the effective date despite the COVID-19 pandemic and the related supply-chain disruptions, Defendants have acted arbitrarily and capriciously. It is impossible for skimmers to comply with the 2019 Final Rule's TEDs requirements through no fault of their own. The COVID-19 pandemic has upended the Final Rule's key assumptions—that TEDs would be available in adequate numbers and that Defendants would be able to train skimmers how to use them.

Because fall shrimping season started on August 9th for the majority of the State, an order from this Court immediately postponing the TEDs Rule's effective date is the only adequate remedy to prevent industry-wide and statewide harm. The APA expressly vests this Court with authority to

5

award that kind of relief; it may, "to the extent necessary to prevent irreparable injury, … issue all necessary and appropriate process to *postpone the effective date of an agency action* or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. §705 (emphasis added). The APA applies here, of course, because the challenged Rule is a "final agency action" promulgated under the Endangered Species Act (ESA) "for which there is no other adequate remedy in a court." 5 U.S.C. §704; *see id.* §706(2)(A).

An order from this Court delaying the Rule's effective date would break no new ground. In fact, Defendants themselves have already delayed the Rule's original effective date, citing the need "to allow for the manufacture of the necessary number of TEDs and for fishers, particularly lower income fishers, to prepare financially for the regulation." 86 Fed. Reg. at 16676. Further justifying delay, Defendants explained that the COVID-19 pandemic prevented them from "conduct[ing] outreach on changes to TED regulations through in-person industry workshops and trade shows, dockside and net shop visits, and enforcement trainings." *Id.* Beyond that, "[s]afety and travel restrictions due to the COVID-19 pandemic have limited [Defendants'] ability to complete the in-person workshops and training sessions that [they] had anticipated and communicated to the public." *Id.* at 16677. The delay in effective date, Defendants explained, was thus "necessary to provide [Defendants] with additional time to conduct our planned outreach and training for fishers through a modified strategy, including but not limited to, virtual training sessions with the public." *Id.* Besides educating the public generally on the use of the devices, the Department said that it needed this delay to "prepare . . . for responding to installation and maintenance problems from industry when the regulations go in effect." *Id.*

Not one of those justifications has changed. Each remains the same today and warrants an order from this Court further delaying the 2019 Final Rule's effective date for the very same reasons. the lack of available materials and workforce in the net-shop industry, depressed financial conditions

6

in the shrimping industry, and COVID-19-related interruptions to training and outreach compound the harms certain to follow if the Court does not delay the TEDs Rule effective date but requires the Department to enforce it now. Consider each circumstance in turn.

First, the COVID-19 pandemic resulted in NOAA breaking its promise to do adequate in-person checks and programming. To be sure, NOAA has conducted some virtual trainings since March, but the lack of in-person instruction leaves the entire industry—shrimpers, the net shops, and the Department's enforcement agents—floundering, with shrimpers subject to steep fines and penalties for non-compliance. Because the inshore skimmer trawl fleet has never been subject to TEDs requirements before the 2019 Final Rule, shrimpers are confused about what the Rule requires and how to adequately comply with it. For example, even after NOAA's virtual training, the skimmer fishermen in Louisiana are still unsure if they have installed their TEDs correctly. That matters because, under the Rule, the smallest (and unforeseen) shift in the angle of the TED results in $10,000 fines. Compounding that problem, supply-chain issues are reportedly affecting the availability of angle-measuring tools that fishermen need to self-check compliant angles. So if the Rule isn't delayed, the Department will have to penalize fishermen for minor violations that they cannot self-correct and that could have been prevented with the promised educational outreach and implementation checks. The Department aims to prevent the Rule's effective date at least until Defendants can properly educate shrimpers on correct installation, maintenance, and usage.

Second, and as the original delay announcement acknowledged, many shrimpers are hurting financially. Last March, many shrimpers could not afford to purchase the equipment necessary to come into compliance with this new rule. That has not changed since then. *See, e.g.*, Cagle Decl. ¶¶ 13-14; Boudreaux Decl. The shrimping industry as a whole is still recovering from COVID-related financial hardships.

Third, even if shrimpers could afford to comply, they are only half the equation. The other

7

half—the merchants selling the required nets and other equipment—have faced a pandemic-induced lack of raw materials and shortage of industry workers that has resulted in net shops being booked solid, unable to install new nets. Boyd Decl. Take net-shop owners like declarant Bob Boudreaux, whose declaration confirms that he cannot stock up on TEDs or the necessary gear to comply with the Rule. The industry could not have proactively purchased materials before this Rule took effect because the industry cannot recoup those costs if the Rule were amended slightly, thereby rendering non-compliant any gear that shop owners would have proactively purchased.

And now that the 2019 Final Rule's requirements are set—theoretically allowing net shops to acquire and build compliant gear—net shops have suffered pandemic-induced supply-chain impossibilities to finding the necessary items to do so. The Rule requires a new, smaller type of twine of which there is a shortage. Net shops have also found that there is a shortage of aluminum—and a lack of aluminum means a lack of frames. Beyond that, a shortage of angle-measuring devices has prevented fishermen and shop owners from maintaining compliant gear.

Building fishing gear is a very time-consuming business in the best circumstances. *See generally* Boudreaux Decl. Accommodating TED rules is an even more intricate affair. Each TED order is custom and bespoke. The frames are handmade and welded to fit different sizes and types of boats with different concerns and preferences. Like the frames, the netting is handmade, stitched for each net. In short, these items are not available via two-day Amazon Prime delivery. They take significant time and money to make—particularly at the high quality necessary to comply with the law.

And COVID prevented NOAA from conducting follow-up come-and-see sessions with net shop owners, too. Those outreach programs—meant to teach net builders who have never done this before—would have helped prevent untrained net shops from installing non-compliant gear.

In sum, this rule effects more than a thousand boats that never before needed TEDs. Because of the pandemic, net shops have had trouble hiring welders and other skilled employees to

keep up with the demand this new Rule created. The net-shop industry simply lacks the manpower and raw materials necessary to meet the sudden needs of a thousand boat owners simultaneously seeking thousands of TEDs to comply with the new Rule.

The industry and Plaintiff have acted in reliance on Defendants' commitment in the Final Rule to provide training and allow for adequate time for the manufacture of TED equipment. An agency's failure to consider significant reliance interests is an independent ground for vacatur. Defendants have utterly ignored the "'legitimate reliance'" on its own statements in the Final Rule. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). Defendants are thus selectively implementing the rule by enforcing the effective date while ignoring its numerous promises to aid industry compliance and allow for adequate time to manufacture TEDs. Accordingly, their failure to extend the effective date is arbitrary and capricious.

Finally, NOAA's refusal to grant further relief conflicts with prior agency precedent. NOAA has never before hesitated to delay or suspend TED requirements for however long necessary to allow the industry to continue to function in the midst of a disaster. For example, between September 28, 2005, and March 20, 2006, NOAA issued a series of rules suspending TED requirements "because environmental conditions resulting from Hurricanes Katrina and Rita are preventing some fishers from using TEDs effectively." *See, e.g.*, 71 Fed. Reg. 8990 (Feb. 22, 2006). NOAA did the same in response to Hurricanes Gustave and Ike. *See, e.g.*, 73 Fed. Reg. 66803 (Nov. 12, 2008). Like cases must be treated alike. Here, as there, the industry is unable to employ TEDs effectively because of a disaster. And the agency has identified no reason why anything has changed since its initial COVID-19 Delay Rule. Simply put, industry cannot comply despite all good-faith efforts to do so. Agency precedent is clear—another effective-date delay is required as a fundamental element of reasoned decisionmaking. *See, e.g.*, *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007) ("[F]undamental norm of administrative procedure requires an agency

to treat like cases alike."); *Burlington Northern and Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 776 (D.C. Cir. 2005) (agency "must provide an adequate explanation to justify treating similarly situated parties differently"). Defendants' "'[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016).

## II. THE STATE OF LOUISIANA IS SUBSTANTIALLY LIKELY TO SUFFER IRREPARABLE HARM IF THE TEDs RULE'S EFFECTIVE DATE IS NOT DELAYED.

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, "[t]he plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id.*[1]

The irreparable harm here is extensively documented through the attached declarations. With the fall shrimping season for a majority of the State having started on August 9th and an estimated fifty percent of Louisiana's skimmer trawl fleet out of compliance, the LDWF faces an unprecedented, imminent enforcement problem. Requiring LDWF to enforce the new TEDs Rule now will result in substantial interference with, and loss of, its enforcement staff to carry out its other obligations. *See* Hebert Decl. This diversion of the State's enforcement personnel and priorities to a federally mandated program imposes significant regulatory and administrative burdens and constitutes irreparable harm to the State's sovereign interests. *See, e.g., Texas v. United States*, 2021 WL 247877, at *5 (S.D. Tex. Jan. 26, 2021); *see also District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 39 (D.D.C. 2020) ("Based on these attested-to estimates of additional E&T costs, the

---

[1] Money damages are unavailable due to sovereign immunity. *See, e.g., Louisiana v. Biden*, 2021 WL 2446010, at *21 (W.D. La. June 15, 2021) ("The Plaintiff States have alleged very substantial damages from Government Defendants, which would be difficult, if not impossible to recover, due to sovereign immunity.").

10

burdens of training new and existing staff, and the burdens associated with noticing ABAWDs, the state plaintiffs have shown that absent an injunction or stay they will suffer immediate, irreparable injury in the form of significant regulatory and administrative burdens.").

To begin, consider that LDWF is already operating with less than a full complement of enforcement field agents and staff. At full strength, LDWF would have 234 enforcement staff and field agents, but LDWF enforcement is currently limited to 206 agents due to ongoing funding constraints. *See* Hebert Decl. ¶ 2. Because of those limits, LDWF enforcement has eliminated its Statewide Strike Force Unit, which historically has enforced commercial fishing regulations along the coast during periods of high-volume enforcement activity—like shrimping season. And among LDWF's remaining enforcement field agents, only 98 of 204 are properly trained and authorized to enforce TEDs regulations. *See* Hebert Decl. ¶ 4.

Fortunately, those trained LDWF enforcement agents rarely observe violations on skimmers in Louisiana waters. In fact, over the past five years, there has only been one tow time violation on skimmers. *See* Hebert Decl. ¶ 8. Observations of LDWF enforcement show that historic tow-time restrictions have an extremely high compliance rate and that tow-time restrictions are sufficient for the limited turtle interactions during LDWF enforcement activities. Given those historical observations, it is highly improbable that there will be significant sea turtle interactions with skimmer vessels in Louisiana inshore waters, and virtually no sea turtle mortality as a result of skimming activity if tow-time restrictions remain in place. The upshot? Unless the Rule is delayed, the Department's enforcement costs will skyrocket—with almost no corresponding benefit for the protected species.

If this sort of additional high-cost-low-benefit enforcement is a critical priority for the Federal Government, it could always pay for it itself. The National Marine Fisheries Service has a Joint Enforcement Agreement with the Department. Through that agreement, NMFS could provide

11

additional and commensurate funding for TEDs Rule enforcement. Yet so far, NMFS has not granted any additional funding. Nor does the Department expect it to, despite the additional LDWF Enforcement efforts the Rule requires. As a result, the TEDs Rule—if not delayed—will necessarily impose additional strain on LDWF Enforcement resources. That's the very sort of irreparable harm a temporary restraining order is designed to prevent.

Finally, the harm is ongoing and irreparable because skimmers are unable to comply with the Final Rule and thus are—at this very moment—sitting out the 2021 season. Due to COVID-19, there are a grossly insufficient number of TEDs manufactured. *See* Eva Alario Decl. ¶ 1, 5. Skimmer captains wish to comply with the Rule but are prevented by literal impossibility and thus forced to miss the season. *See* Boyd Decl. ¶ 8. ("Without the ability to purchase another TED while the first TED is still backordered, it doesn't look like we will be making the opening."). Without an immediate TRO, a substantial portion of Louisiana's shrimping industry will be sidelined through no fault of their own.

## III. THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR GRANTING A TEMPORARY RESTRAINING ORDER.

Finally, the public interest and balance of equities weigh in favor of granting the State a temporary restraining order. Simply put, Defendants "have no legitimate interest in the implementation of [the] unlawful" 2019 Final Rule. *Texas*, 2021 WL 723856, at *49. Instead, "the public is served when the law is followed." *Id.* at *51 (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)); *see also League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). The public has an overriding interest in ensuring that the shrimping industry does not lose an entire season due to an arbitrary failure to extend the effective dates. And while the State of Louisiana would be irreparably harmed by the implementation of the 2019 Final

Rule, Defendants have no interest in enforcing an arbitrary rule. Accordingly, the public interest and balance of harms weigh heavily in the State's favor.

Notably, this is not the first time this Court has been faced with a request to delay a TEDs rule. When TEDs were first implemented on other parts of the shrimp industry, this Court delayed the rule. *State of La. ex rel. Guste v. Verity*, 1988 WL 35036, at *2 (E.D. La. Apr. 12, 1988). The Court explained "the balance of equities are 'heavily tilted' in the movant's favor." *Id.* at *1. "The affidavits of the shrimpers, submitted by the plaintiff, demonstrate that they will be exposed to substantial penalties ($10,000 for each violation) if they do not comply with the regulations." *Id.* "However, the shrimpers are unable to comply with the regulations even if they wanted to." *Id.* "The shrimpers testify that they are unable to obtain TEDs and that they lack training on the use of the TEDs." *Id.* "In addition, the shrimpers testify that they experience many hours of down time and TEDs which have to be constantly cleared of mud and debris leading to substantial losses of shrimp." *Id.* The same is true in this case, where Defendants have shown no rush to implement the 2019 Final Rule, TEDs cannot be obtained, and Defendants have failed to provide promised training.

## IV. THIS COURT SHOULD POSTPONE THE FINAL RULE'S EFFECTIVE DATE.

The APA empowers a "reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. §705. A stay of the effective date should issue "to the extent necessary to prevent irreparable injury" and "[o]n such conditions as may be required." *Id.*; *see also Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (staying an EPA action pending review).

When considering "whether to stay an agency action pending judicial review," district courts apply the same test used for temporary restraining orders and preliminary injunctions. *Texas v. United States*, 95 F. Supp. 3d 965, 973 (N.D. Tex. 2015); *see also IHG Healthcare, Inc. v. Sebelius*, 2010 WL 11680368, at *1 (S.D. Tex. Apr. 1, 2010); *Safety Nat'l Cas. Corp. v. U.S. Dep't of Homeland Sec.*, 4:05-cv-

13

2159, 2005 WL 8168878, at *2 (S.D. Tex. Dec. 9, 2005). Accordingly, for the reasons explained above, Plaintiff has made the showing necessary for a stay.

Unlike a standard TRO, which is limited to 14 days, Fed. R. Civ. P. 65(b)(2), a stay of a rule's effective date under the APA lasts as long as necessary "to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. As a result, a stay of the 2019 Final Rule's effective date would allow the Court to maintain the status quo pending a preliminary injunction hearing regardless of the schedule the Court chooses moving forward.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's Emergency Motion for a Temporary Restraining Order.[2]

---

[2] Prior to filing this motion, Counsel for Plaintiffs emailed the head of the Civil Division for the U.S. Attorney's Office for the Eastern District of Louisiana and advised him of the substance of this motion. *See* Exh. A. Counsel for Plaintiffs also attempted to email the NOAA general counsel, but her published email address did not work.

Dated: August 11, 2021 Respectfully submitted,

**JEFF LANDRY**
**ATTORNEY GENERAL**

  /s/ *Elizabeth B. Murrill*

ELIZABETH B. MURRILL
  *Solicitor General*
JOSEPH S. ST. JOHN
  *Deputy Solicitor General*
MACHELLE HALL
  *Assistant Attorney General*
LOUISIANA DEPT. OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
emurrill@ag.louisiana.gov
Tel:    (225) 326-6766
stjohnj@ag.louisiana.gov
Tel:    (225) 485-2458
hallm@ag.louisiana.gov
Tel:    (225) 421-7560

*Counsel for Plaintiff State of Louisiana*[3]

---

[3] Consistent with L.R. 5.2, Plaintiffs inform the Court that Attorney Machelle Hall is available and may be reached via telephone at 225-421-7560. Attorneys Elizabeth Murrill and Joseph St. John may be in transit on Friday, August 12.